UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEBORAH ROSE,                        )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    No. 4:06 CV 998 DDN
                                     )
MICHAEL J. ASTRUE,[1]                )
Commissioner of Social Security,     )
                                     )
            Defendant.               )
                                     )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the applications of plaintiff Deborah Rose for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381 et seq. The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 17.)

After careful review, the court affirms the decision of the Commissioner.

**I. Background**

Plaintiff Deborah Rose is a 54-year-old woman, born on June 17, 1953. (Tr. 76.) Rose measures 5'4" with a weight that has ranged from 192 pounds to 232 pounds. (Tr. 41, 135.) Rose received a seventh grade education, cannot read, and does not have a driver's license.[2] (Tr. 41,

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C. § 405(g).

[2] When examined by her lawyer at the disability benefits hearing, Rose stated she could not read. (Tr. 41.) When examined by the ALJ, Rose stated she could read and might pick up a newspaper sometimes. (Tr. 53.) It seems Rose knows how to read, but because of her eyesight, cannot see the print well enough to read. (Tr. 115.)

44.) From 1985 to 1999, she worked as hotel maid. For a few months in 1999, she babysat. She has not worked any other jobs. (Tr. 41, 91, 104.)

Rose first applied for disability benefits on January 8, 2002, alleging she became disabled on October 30, 1998. (Tr. 19.) An administrative law judge (ALJ) denied the application on July 17, 2003. (Tr. 19, 55-65.) There was no subsequent appeal. (Tr. 19.)

Rose filed another application for disability benefits on December 2, 2003, alleging she became disabled on July 18, 2003. (Tr. 76-83.) In her application, she complained of lower back pain, leg pain, high blood pressure, arthritis, and diabetes. (Tr. 79.) In her disability report, Rose also complained of upper back pain, pain in her left knee and left foot, and "COD," a form of emphysema.[3] (Tr. 90.) Following a hearing on April 19, 2005, an ALJ denied benefits on June 15, 2005. (Tr. 16-28, 37-54). On April 26, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-10.)

## II. Medical History

Deborah Rose claims she became disabled on July 18, 2003, at the age of 50. (Tr. 40, 76.) Rose's relevant medical history begins on January 14, 2003, with a gallbladder ultrasound performed at the Myrtle Hilliard Davis Comprehensive Health Center (Health Center). The ultrasound revealed small echo densities along the gallbladder, consistent with the presence of small mobile gallstones, confirming the impression of cholelithiasis.[4] The liver and pancreas appeared unremarkable. (Tr. 142.)

---

[3] COD likely refers to COPD, or chronic obstructive pulmonary disease, which was diagnosed by Dr. Haque on February 27, 2004. (Tr. 146.)

[4] Cholelithiasis is the presence of concretions in the gallbladder or bile ducts. Stedman's Medical Dictionary, 295 (25th ed., Williams & Wilkins 1990) (1911)

-2-

On February 7, 2003, Rose visited the Health Center complaining of lower back pain and abdominal pain. She weighed 230 pounds and had a blood pressure of 130/86. (Tr. 131.)

On May 13, 2003, Rose complained of back pain and heart burn. She was diagnosed with hypertension and gastroesophageal reflux disease (GERD). She weighed 230 pounds and had a blood pressure of 140/90. (Tr. 132.)

On June 30, 2003, Rose sought treatment for a three day history of back pain. She weighed 229 pounds, measured 5'5", and had a blood pressure of 158/82. (Tr. 133.) The next day, during a follow up, Rose did not have any complaints and reported a pain range of zero. The notes indicate Rose was unable to either stand or sit for more than thirty minutes. (Tr. 134.)

On September 11, 2003, Rose returned to the Health Center for a refill of her medications. At the time, she weighed 228 pounds and had a blood pressure of 160/98. She was diagnosed as obese and suffering from hypertension. The notes indicated she was a smoker, but was not suffering from shortness of breath. She was advised to quit smoking. (Tr. 135.)

On October 16, 2003, Rose complained of pains in her right leg and upper back, across the shoulders. She weighed 232 pounds and had a blood pressure of 150/90. (Id.) John Hartweger, M.D., noted she suffered from hypertension, GERD, obesity, cholelithiasis, and tobacco abuse. He also diagnosed her with a new onset of type II diabetes mellitus, hypertension, chronic bronchitis, and osteoarthritis. She received a number of prescriptions for each diagnosis. (Tr. 136.)

On October 24, 2003, Rose came in for a follow-up. She weighed 224 pounds and her blood pressure was 140/90. The notes from the Health Center indicated she was exercising more and smoking less. (Tr. 138.)

In a social security form, dated December 31, 2003, Rose noted she could not do her housework, care for the lawn, grocery shop, or go to the post office. She used to cook for herself, but the arthritis prevented her from doing so anymore. Rose could bathe herself, but required help ironing her clothes and combing her hair. (Tr. 114.)

On January 27, 2004, Rose complained of abdominal cramping, bloating, and lower back pain. On the other hand, she noted fewer episodes of sharp chest pain. Dr. Hartweger diagnosed her with abdominal pain, cholelithiasis, chest pain, hypertension, type II diabetes mellitus, and insomnia. (Tr. 140.)

On February 27, 2004, Rose saw Zahirul Haque, M.D., a doctor affiliated with the Forest Park Medical Clinic. At the time, she was complaining of shortness of breath, hypertension, diabetes, back pain, and joint pain. Dr. Haque evaluated each of her illnesses, noting that Rose had complained of shortness of breath since 2002, hypertension since 1995, diabetes since late 2003, back pain since a work-related injury in 1999, and joint pain since around 1999. (Tr. 146.)

Dr. Haque noted the limitations each illness imposed. According to Rose, she could walk only one block and climb ten steps without shortness of breath. Her back and joint pain limited her to walking one block, standing for five minutes, and sitting for ten minutes. Rose said she could lift eight pounds, but bending and squatting produced back spasms. She did not require any assistance in walking or with her joint pain. She was able to perform light housework, and had no difficulty writing, holding a cup of coffee, or buttoning a shirt. (Tr. 146-47.)

Despite the lengthy period associated with each ailment, Dr. Haque noted Rose had never been hospitalized or to an emergency room for shortness of breath. In addition, he noted she has not visited a chiropractor or physical therapist for her back pain, and there was no history of any major surgeries. In general, Dr. Haque noted Rose looked comfortable and did not appear to be in any acute distress. Her speech, hearing, and conversation all appeared normal. At the time of the examination, Rose weighed 200 pounds, measured 5'4", and had a blood pressure of 150/84. (Tr. 147.)

Examining her lungs, Dr. Haque found no wheezing, crackles or rhonchi.[5] Her back showed a slight paraspinal muscle spasm, but no tenderness of the spine. Her circulation at the extremities looked

---

[5] Rhonchi are breathing sounds that would indicate inflammation of the lungs. Stedman's Medical Dictionary, 1361.

good, with no indication of clubbing, cyanosis, or edema.[6]  Examining her musculoskeletal system, Dr. Haque found Rose had a normal gait and posture.  She was able to get on and off the examination table without difficulty and moved around the room without any problems.  Rose had normal bending and squatting, but complained of back pain while doing it.  Dr. Haque did not notice any joint deformity, joint swelling, muscle atrophy, or muscle wasting.  Her neurological exam was normal. (Tr. 148.)

In his clinical impression, Dr. Haque diagnosed Rose with chronic obstructive pulmonary disease, but no wheezing or crackles.  Rose was also diagnosed with a history of hypertension and diabetes, but without any end organ disease.  Finally, Dr. Haque noted Rose had a history of back pain and had a slight muscle spasm paraspinally.  (Tr. 149.)

On March 8, 2004, Rose performed a series of physical movements to test her range of motion.  The range of motion test indicated Rose had normal grip strength, normal upper extremity strength, and normal lower extremity strength.  The tests were performed at the Forest Park Medical Clinic.  (Tr. 151-52.)

On December 1, 2004 to December 2, 2004, Rose was hospitalized after complaining of chest pain.  She was discharged without restriction and her condition was noted as stable and improved upon discharge.  (Tr. 153-155.)  Respiratory, cardiovascular, and musculoskeletal examinations were all within normal limits.  (Tr. 171A-172.)

On March 15, 2005, Dr. Hartweger provided a summary of Rose's medical history.  As of March 15, her medications included Accupril, HCTZ, Atenolol, Glucotrol XL, Celebrex, and Zoloft.  His diagnoses were hypertension, type II diabetes mellitus, osteoarthritis, tobacco abuse, and depression.  Dr. Hartweger noted that he had been seeing Rose since October 16, 2003.  In his opinion, her hypertension and diabetes were under control, but she continued to experience hand and knee pain stemming from her arthritis.  She also continued to smoke, producing a

---

[6] Clubbing is the broadening of the fingers or toes.  Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood.  Edema is an accumulation of watery fluid in cells, tissues, or cavities.  Stedman's Medical Dictionary, 320, 383, 489.

chronic cough and shortness of breath. She still slept poorly, he noted. In his opinion, the respiratory problems and chronic joint pain combined to limit her mobility and endurance. In light of her impairments, Dr. Hartweger concluded Rose could not perform sustained full-time employment. His reasoning was quite terse. "No. See Above," Dr. Hartweger wrote, explaining why he believed Rose could not perform full-time employment. (Tr. 198.)

On November 21, 2005, Dr. Hartweger elaborated on his previous statements, providing another summary of Rose's medical history. In his new summary, Dr. Hartweger emphasized Rose's mental state. He listed depression as the first diagnosis and Zoloft as the first medication. (Tr. 207.) In his March 2005 summary, Dr. Hartweger had listed depression and Zoloft last. (Tr. 198.) He also mentioned that Rose was severely depressed, suffering mood swings and crying spells, when he met with her on October 12, 2005. (There is no contemporaneous report of this October 12 visit in the record.) As a result, Dr. Hartweger concluded that Rose could not perform competitive full-time employment "due to both her mental state and physical condition." That said, Dr. Hartweger still thought Rose could possibly work four hours a day within an eight-hour workday. (Tr. 207.)

### Mental Health History

On July 19, 2004, Rose sought psychiatric and support services at the Hopewell Center. (Tr. 187.) She reported difficulty sleeping, pacing, headaches, and trouble with bronchitis and diabetes. (Tr. 188.) Rose denied receiving any previous psychiatric services. (Tr. 189.) Rose was diagnosed with major depressive disorder and prescribed Paxil and Desyrel. (Tr. 43.) She received a GAF score of 45.[7] (Tr. 186.)

---

[7] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 45 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental

On April 12, 2005, Rose returned to the Hopewell Center. She stated she was depressed, felt nervous, her mood varied, and she was having problems sleeping. Her general appearance and behavior were despondent. She was ultimately diagnosed with major depressive disorder, prescribed Sertraline and Seroquel, and told to return in two months. She did not receive a GAF score. (Tr. 199-201.)

### Other Prescribed Medications

On December 2, 2003, Rose completed a disability report. In the report she listed her prescribed medications. Rose took Accupril, Aspirin, and HCTZ for her blood pressure. She took Glucotrol XL for her diabetes and Naproxen for her arthritis. In each case, Dr. Hartweger provided the prescriptions. (Tr. 95.)

On February 27, 2004, Dr. Haque provided a past medical history of Rose. As part of her history, he provided a list of her prescribed medications. At the time, Rose was taking Accupril, Hydrochlorothiazide (HCTZ), Naproxen, and Glucotrol XL. She was also taking Elavil, Prevacid, and Atenolol.[8]

On April 13, 2004, Rose completed a disability report appeal. In the report, she again listed her prescribed medications. Rose was still taking Accupril, Glocotrol XL, Naproxen, Prevacid, and HCTZ. In each case, Dr. Hartweger provided the prescriptions. (Tr. 121.)

On March 15, 2005, Dr. Hartweger provided a summary of Rose's medical history. As of March 15, her medications still included Accupril, HCTZ, Glucotrol XL, and Atenolol. She was also taking Celebrex and Zoloft.[9] (Tr. 198.) On November 21, 2005, Rose was still

---

Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[8] Elavil is used to treat depression. Prevacid is used to treat stomach ailments such as GERD. Atenolol is used to treat chest pain and high blood pressure. http://www.webmd.com/drugs. (Last visited August 1, 2007.)

[9] Celebrex is an anti-inflammatory drug used to treat arthritis. Zoloft is used to treat depression. http://www.webmd.com/drugs. (Last visited August 1, 2007.)

taking the Accupril, HCTZ, Glucotrol XL, Atenolol, Celebrex, and Zoloft. (Tr. 207.)

**Testimony at the Hearing**

At the April 19, 2005 hearing, Rose testified that her job housekeeping required her to be on her feet for eight hours a day. The job entailed loading laundry onto a cart, which could weigh anywhere up to twenty-five or thirty pounds. She would also have to push the laundry cart and her vacuum cleaner. (Tr. 42.)

In her current state, Rose explained that she could walk no further than a block before becoming short winded and having her knees ache. She noted that she could stand for no more than ten minutes and sit for no more than fifteen minutes before experiencing back pain. She could only climb halfway up a flight of stairs before needing rest. (Tr. 45.) Because of her back, she could probably lift no more than ten pounds. (Tr. 46-47.) She also had arthritis in her hands and knees. (Tr. 46.)

Rose testified that she is able to dress and bathe herself, but her daughter and grandson perform most of the chores; they do the laundry, clean the house, cook and buy groceries, and care for the lawn. (Tr. 47, 51-52.) At the hearing, Rose noted that she had no present income. Her son and daughter pay for her electricity, while food stamps help cover her groceries. She received unemployment benefits in 1998 and 1999. (Tr. 52.)

Rose used to attend church regularly, but rarely goes any longer. (Tr. 47.) Ever since her children's deaths, she has felt depressed. She cries often and prefers to be by herself. (Tr. 48.) At one point, she tried to hurt herself. (Tr. 48-49.) Rose takes Paxil and Desyrel for her depression. (Tr. 43.)

Typically, Rose awakes at 7:30 or 8:00 in the morning. She tries to go to bed around 10:00 at night, but between her anxiety and back problems, often has trouble sleeping. (Tr. 49-51.)

### III. General Legal Principles

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by

substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

Here, the Commissioner determined that plaintiff maintained the residual functional capacity (RFC) to perform light work, and could perform her past relevant work. The burden remains on plaintiff to prove she is unable to perform her past relevant work. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

## IV. Decision of the ALJ

On June 15, 2005, the ALJ found that Rose was not disabled within the meaning of the Social Security Act. (Tr. 28.) The ALJ noted that Rose suffered from several ailments - chronic obstructive pulmonary disease, mild degenerative joint disease of the hips and lumbar spine, obesity, major depressive disorder, hypertension, diabetes mellitus, and

gastroesophageal reflux disease – and these ailments could be considered severe. (Tr. 23, 27.) Although severe, the ALJ noted that Rose's ailments would not prevent her from performing her past relevant work. The ALJ believed Rose's allegations regarding her limitations were not completely credible and found that she maintained the residual functional capacity (RFC) to lift twenty pounds occasionally and ten pounds frequently. Rose could also stand or walk more than six hours in an eight-hour workday (with normal breaks) and sustain more than simple work activity. Rose's past work as a housekeeper fell within her RFC. (Tr. 28.)

In reaching these findings, the ALJ favored the opinions of Dr. Haque over those of Dr. Hartweger. According to the ALJ, Dr. Haque's opinions were supported by clinical signs, symptoms, and other objective medical findings contained in the record. Meanwhile, Dr. Hartweger's opinions were conclusory, unsupported by any objective clinical findings or explanations. More to the point, the ALJ found Dr. Hartweger's conservative treatment of Rose contradicted his opinions concerning her work ability. (Tr. 24.)

The ALJ also discredited some of Rose's own testimony. First, the ALJ did not believe Rose's physical ailments were as disabling as she maintained. Rose could live and function independently. Her doctors, treating and otherwise, had not placed any specific long-term or work-related restrictions on her activities. Any limitations on her daily activities seemed a matter of personal choice. (Tr. 25.)

Second, the ALJ did not believe Rose's conditions and pain were as severe as she maintained. Rose had never required emergency room treatment, hospitalization, surgery, or physical therapy for any of her alleged ailments. The ALJ also noted that Rose was not taking any strong prescription pain medication and did not require the assistance of any orthotic devices. In his opinion, the minimal or conservative treatment was inconsistent with any disabling condition. ( Id.)

More specifically, the ALJ took issue with Rose's complaints of breathing difficulties and hip pain. Despite the alleged breathing difficulties, Rose continued to smoke against medical advice. She had never been hospitalized or gone to the emergency room for respiratory

distress. Chest x-rays did not indicate any evidence of pulmonary disease and physical examinations did not reveal any signs of wheezing, rales, or rhonchi.[10] (Id.)

Likewise, physical examinations did not produce any evidence of joint abnormality or inflammation. Rose had a normal gait and posture, and could walk unassisted. She also had no trouble bending or squatting. There were no signs of muscle atrophy or muscle weakness, bowel or bladder dysfunction, or neurological deficits. The ALJ also found that there was no objective clinical evidence of degenerative joint disease of the hands, knees, or right ankle. (Tr. 25-26.)

The ALJ was willing to afford Rose "the benefit of the doubt," and find she suffered from a "severe" mental impairment. The ALJ found Rose suffered from major depressive disorder, which imposed significant mental functional limitations. Among these limitations, the ALJ found Rose placed mild restrictions on her daily living activities, had mild difficulties maintaining social functioning, and had moderate difficulties maintaining concentration, persistence, and pace. (Tr. 24.)

That said, the ALJ still thought Rose's mental health problems were exaggerated. Rose had never sought formal treatment from a psychologist or psychiatrist. She had never been hospitalized or sent to a crisis center or emergency room for mental health issues. In addition, Rose had received treatment in July 2004, yet did not return for additional mental health treatment until April 2005. Finally, the ALJ noted that Rose did not have any serious deterioration in her personal hygiene, daily activities, interests, effective intelligence, reality contact, thought processes, memory, speech, mood, affect, attention span, insight, judgment, behavior patterns, or motor activity. (Tr. 26.) None of the objective medical evidence indicated Rose's mental health significantly impaired her ability to think, understand, remember, communicate, concentrate, get along with others, handle normal work stress, or carry out detailed instructions. (Tr. 25, 26.) As a result, the ALJ concluded that Rose's depressive disorder was not disabling, and

---

[10] Rales is a somewhat imprecise term, but generally refers to any added sound heard during breathing. Stedman's Medical Dictionary, 1312.

-11-

that she had the capacity to sustain the basic mental demands of competitive, simple work activity on a regular basis. (Tr. 25.)

The ALJ also noted that Rose did not appear to be under any mental or physical distress at the hearing. Based on all these findings, the ALJ found Rose was capable of working and was not disabled. (Tr. 26.)

### V. Plaintiff's grounds for relief

Rose argues that the ALJ's decision is not supported by substantial evidence. Specifically, she argues that the ALJ (1) failed to explain why Dr. Haque's opinion was afforded greater weight than Dr. Hartweger's opinion, and (2) failed to consider the effects of her depression on her ability to work full-time. (Doc. 18.)

### VI. Discussion

The ALJ found Rose maintained the RFC to lift twenty pounds occasionally and ten pounds frequently. He also found Rose could stand or walk more than six hours during a normal eight-hour workday. He believed Rose could sustain more than simple work activity and that her past work as a housekeeper fell within her RFC.

The residual functional capacity is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a); Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). When determining plaintiff's RFC, the ALJ must consider "all relevant evidence" but ultimately, the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id. In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but must consider at least some supporting evidence from a professional. See 20 C.F.R. § 404.1545(3); Baldwin, 349 F.3d at 556.

#### 1. Failure to Credit Dr. Hartweger's Testimony

When determining the RFC, "[t]he opinions of the claimant's treating physicians are entitled to controlling weight if they are

supported by and not inconsistent with the substantial medical evidence in the record." Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004). A treating physician's opinions are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data. Id. at 805-06. The opinion of a consulting physician who examines a claimant once - or not at all - generally receives very little weight as well. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ must provide reasons for the particular weight given to a treating physician's assessment. 20 C.F.R. § 404.1527(d)(2); Singh, 222 F.3d at 452. Regardless of the doctor's experience with the patient, statements that a claimant cannot be employed count as opinions concerning the application of the statute - and not medical opinions. Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991). Opinions relating to the application of the statute are best left to the Commissioner. Krogmeier, 294 F.3d at 1023.

In this case, the ALJ considered the reports of both Dr. Hartweger and Dr. Haque. In favoring the findings of Dr. Haque over those of Dr. Hartweger, the ALJ noted that Dr. Hartweger's opinions were conclusory and unsupported by objective clinical findings or explanations. The ALJ properly considered and discredited the opinions of Dr. Hartweger.

Dr. Hartweger began seeing Rose in October 2003 and reported seeing her as late as October 12, 2005. Yet, in all this time, there is no record of Dr. Hartweger ever performing any clinical tests on Rose. In a recurring pattern, Rose would visit the Health Center complaining of chest pains, back pains, or abdominal pains, and Dr. Hartweger would note his diagnosis in the Health Center records and prescribe the appropriate medications. Dr. Hartweger never indicated he performed any objective tests or trials to substantiate his opinions. In his March 15, 2005 summary, Dr. Hartweger concluded that Rose could not perform sustained full-time employment, yet provided no medical evidence to support this statement. A few months later, Dr. Hartweger still offered no specific, concrete medical evidence to support his conclusion that Rose could not perform her work. He simply wrote that Rose was unable

to work "at this time due to both her mental state and physical condition."

Despite those assertions, objective medical testing supported the opposite conclusion. In his evaluation of each of her illnesses, Dr. Haque found little objective evidence to support Rose's allegations. Examining her lungs, Dr. Haque found no wheezing, crackles, or rhonchi. He noted her back showed a slight muscle spasm paraspinally, but no tenderness of the spine. Examining her musculoskeletal system, Dr. Haque found Rose had a normal gait and posture, and did not have joint deformity, joint swelling, muscle atrophy, or muscle wasting.

Further testing showed little evidence of disability. A range of motion test indicated Rose had normal grip strength, normal upper extremity strength, and normal lower extremity strength. After being hospitalized for chest pains, Rose was discharged without restriction and noted to be in stable condition. Respiratory, cardiovascular, and musculoskeletal examinations were all within normal limits.

Based on the record, there was substantial evidence to support the ALJ's decision to give greater weight to the opinions of Dr. Haque and less weight to the opinions of Dr. Hartweger. There was also substantial evidence to support the ALJ's finding that Rose had the RFC to return to her past work on a regular basis.

### 2. Failure to Consider Rose's Depression

The ALJ was willing to afford Rose the "benefit of the doubt" and find she suffered from a severe mental impairment, namely major depressive disorder. The depressive disorder imposed significant mental functional limitations for Rose. That said, the ALJ thought Rose was exaggerating her mental symptoms and that she still had the capacity to sustain the basic mental demands of competitive, simple work activity on a regular basis.

The ALJ clearly considered Rose's allegations of depression and did not commit any error in discounting them. Rose claimed she became disabled on July 18, 2003, yet waited until July 19, 2004, to seek psychiatric treatment. She did not return for psychiatric treatment until April 12, 2005. More to the point, Rose never mentioned

-14-

depression or any other mental health issues in either her application for disability benefits or her disability report.  Rose was never hospitalized or sent to an emergency room or crisis center for mental health issues.  Finally, Rose never faced any serious deterioration in her personal hygiene, daily activities, or interests.  At the hearing, she mentioned feeling depressed and apathetic, and indicated trying to hurt herself on one occasion.  That said, the ALJ noted Rose did not appear to be under any credible mental distress during the hearing.

In her brief, Rose believes her GAF score should have received greater weight.  The ALJ did not commit error by discrediting the GAF score.  Rose received a GAF score of 45 during her first examination, but did not receive a GAF score during her second visit.  However, an ALJ has the authority to afford greater weight to medical evidence and testimony than to a GAF score, when the evidence so requires.  See Hudson ex re. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003).  Indeed, the Commissioner of Social Security has declined to endorse the GAF scale to evaluate Social Security and Social Security Insurance Claims.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50745, 50764-65 (Aug. 21, 2000).  Based on the record, there was substantial evidence to support the ALJ's finding that Rose's mental health was not disabling, and that she had the RFC to return to her previous work on a regular basis.

## VII.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.


        /S/   David D. Noce
    **UNITED STATES MAGISTRATE JUDGE**

Signed on August 8, 2007.